CALIFORNIAN CANNERIES CO., Limited, v. PACIFIC SHEET METAL WORKS.

(Circuit Court, N. D. California. April 2, 1906.)

No. 13,035.

1. SALES—CONTRACT—PERFORMANCE—DELIVERIES.

Defendant contracted to furnish all the tin cans that should be used in plaintiff's cannery in San Francisco during the packing season of 1899, not exceeding 100,000 cans in any one day. No other contract was entered into with reference to the delivery of cans for that year, and during the season at a meeting of the parties, plaintiff requested defendant to furnish 12,500 cans per day in addition to those delivered under the contract, and permit plaintiffs to divert them to San José, to which defendants replied that they were not bound to furnish any cans except for defendant's cannery in San Francisco, but that if plaintiff desired to divert 12,500 cans daily to San José no serious objection would be made to furnishing them. *Held*, that the cans so diverted should be considered as a portion of the deliveries required by the contract.

2. SAME—FAILURE TO DELIVER—STRIKES.

Where a contract for the sale and delivery of tin cans to be used in a canning factory, and to be delivered daily as ordered, provided that if the seller was unable to perform any of its obligations by reason of a strike such obligations should at once terminate and cease, he was not liable for failure to deliver cans on a day when his employés refused to work.

3. SAME—SUNDAY.

A seller of tin cans to be delivered daily as ordered, was not bound to deliver cans on Sunday.

4. SAME—CUMULATIVE DELIVERIES.

Where a contract provided for the daily delivery of tin cans to a canning factory as ordered, and the seller knew that an excessive delivery on one day was nevertheless all used on that day, he was not excused by such excessive delivery from a failure to deliver the proper order on the succeeding day.

5. SAME—MEASURE OF DAMAGES—EVIDENCE.

Where, in an action for breach of contract to deliver cans to a cannery, there was evidence that plaintiff was compelled to throw away considerable fruit, because the cans were not delivered in sufficient quantities as ordered, and the contract quantity of cans was never delivered, nor was plaintiff able to supply the deficiency, plaintiff was entitled to recover the actual loss sustained consisting of the profits on goods sold, but not delivered because of lack of cans, added to the cost of fruit thrown away and the cost of labor not utilized for the same reason, under Civ.

Code Cal. § 3300, providing that for a breach of an obligation arising from contract, the measure of damages, except as otherwise provided, shall be the amount that will compensate the party aggrieved for all detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.

6. SAME.

Where it was impossible for plaintiff to purchase cans to supply a shortage caused by defendant's breach of a contract to deliver cans to plaintiff's cannery as ordered, plaintiff in an action for breach of such contract was not limited to the measure of damages specified by Civ. Code Cal. §§ 3308, 3354, providing that the detriment caused by the seller's breach of contract is the excess of the value of the property to the buyer over the amount which would have been due to the seller under the contract if it had been fulfilled, etc.

7. SET-OFF AND COUNTERCLAIM—SAME TRANSACTION.

In an action for breach of a contract to deliver cans, defendant was only entitled to counterclaim so much of a note held against plaintiff as represented the price of cans delivered under the contract out of which the controversy arose.

Platt & Bayne and Jellett & Meyerstein, for plaintiff.
Olney & Olney, for defendant.

MORROW, Circuit Judge. Plaintiff and defendant entered into a written contract on April 12, 1899, wherein the defendant agreed to sell and deliver to the plaintiff all the tin cans which should be used in the plaintiff's cannery at San Francisco during the packing season of 1899, not exceeding, however, 100,000 cans in any one day. The sizes, varieties, and prices per thousand were set forth in the contract. It was also provided that from 2,000,000 to 3,000,000 in all of the varieties named of domestic plate, and 3,000,000 of imported plate, should be delivered to the plaintiff between April 12, 1899, and December 31, 1899. The place of delivery was f. o. b. San Francisco at plaintiff's cannery. It was further provided that if the defendant should be unable to perform any of its obligations under the contract by reason of a strike or of damage by the elements, or of any unavoidable casualty, such obligations should at once terminate and cease. Pursuant to this contract the defendant delivered to the plaintiff at San Francisco for the season of 1899 cans made of imported plate, to the number of 2,728,218, and cans made of domestic plate to the number of 2,066,391. Defendant also delivered to the plaintiff for its cannery at San José, 168,000 cans made of imported plate, and 339,380 cans made of domestic plate.

Plaintiff contends that the cans delivered to it at San José were not delivered under the written contract of April 12, 1899, and are therefore not to be considered in determining whether defendant fulfilled its contract. This position cannot be maintained. There is no evidence of any other contract. The cans were delivered by the defendant, and paid for by the plaintiff at the prices agreed upon in the written contract. This circumstance of itself would be sufficient to justify the court in determining that the delivery of cans at San José was in accordance with a mutual agreement and understanding that it should be under the written contract of April 12, 1899, but there is testimony directly establishing that fact. Irwin Ayers, a witness

called by the defendant, testified that he was the general manager of the business of the defendant during the season of 1899. The attention of the witness was called to a conversation that was held in the office of Mr. Olney, the attorney for the defendant, when Mr. Platt, the attorney for the plaintiff, Isidore Jacobs, the managing director of the plaintiff, the witness, and Mr. Olney were present. The witness was asked to state what was said on this occasion. His answer was:

"They [the plaintiff] wanted us [the defendant] to furnish in addition to the 35,000 cans delivered—they proposed that we furnish them 12,500 in addition to that, under their contract, and allow them to divert them to San José, instead of sending them to their cannery on Brannan street in San Francisco."

The witness also testified that Mr. Olney stated to them that the defendant was under no obligation to furnish the plaintiff any cans in San José; that the contract only related to furnishing the company the number of cans which should be used in their cannery in San Francisco; but if they wanted to divert 12,500 cans daily to San José, no serious objection would be made to furnishing them. This testimony stands uncontradicted, and must be accepted as a correct statement of what was said on that occasion. The delivery of cans to the plaintiff for the cannery at San José was therefore part of the contract, and must be considered in determining whether the defendant complied with its terms. As before stated, the defendant delivered to the plaintiff at San Francisco for the season of 1899, 2,728,218 cans made of imported plate, and at San José 168,000 cans made of the same plate, making a total of 2,896,218 cans. It delivered at San Francisco during the same period 2,066,391 cans made of domestic plate, and at San José 339,380 cans made of the same plate, making a total of 2,405,771 cans. The written contract was certain as to the number of cans to be delivered made of imported plate, namely, 3,000,-000. The number delivered at San Francisco and San José being 2,896,218, there was an apparent shortage of 103,782 cans. The written contract was only certain as to the minimum and maximum quantities of cans to be delivered made of domestic plate, namely, between 2,000,000 and 3,000,000 cans. The number of cans of domestic plate delivered at San Francisco and San José was 2,405,771, which was within the minimum and maximum limits.

But this contract contained another provision relating to the quantities to be delivered, as follows:

"The seller agrees to sell and deliver to the buyer, and the buyer agrees to purchase and receive of and from the seller, all the tin cans which shall be used in its or their cannery at San Francisco during the packing season of 1899, not exceeding, however, 100,000 cans in any one day."

This provision of the contract is plainly susceptible of more than one construction, but the parties to it appear to have understood it as meaning that the seller agreed to sell and deliver to the buyer all the tin cans the latter would require at its cannery during the packing season of 1899, providing it did not require more than 100,000 in any one day.

One of the allegations of the complaint is that the defendant knew, at the time of the execution of the contract, that plaintiff would rely upon the strict performance of the same, and so relying, would make contracts to purchase, and would purchase, large quantities of green fruit and vegetables to be delivered to plaintiff from time to time, as such fruit and vegetables matured, and to be canned by plaintiff in said business; that defendant also well knew, at the time of the execution of said contract, that unless said cans were promptly delivered to plaintiff when and as ordered, said fruit and vegetables so purchased and delivered to plaintiff would immediately decay and become useless for canning purposes, and would be thrown away by plaintiff, or sold at a great loss. It is further alleged that plaintiff, from day to day during the packing season of 1899, and between the 12th day of April, and 31st day of December, of said year, ordered of defendant that certain cans be delivered to it as provided in said contract, and of the varieties specified in said contract, and said orders did not exceed 100,000 cans a day for any one day. Plaintiff's claim of damages is based upon the alleged failure of the defendant to deliver the number and variety of cans so ordered by plaintiff under said agreement.

Under the contract, as thus construed by the plaintiff and understood by the defendant, the first question to be determined is the number of cans ordered by the plaintiff during the packing season of 1899. The witness Isidore Jacobs, who was the managing director of the plaintiff during the year 1899, testified that between the 8th of August and the 13th of September he was particularly active in making demands on the defendant for cans; that during that period he did not think a day passed but what the demands were made, not a single day except Sunday; that these demands were made in person, by letter, and by telephone. What demands were made in person or by telephone does not appear in the record. Those that were made by letter are in evidence.

The first letter written to the defendant by the plaintiff upon this subject is dated July 19, 1899. In this letter the plaintiff says:

"As you are aware, our contract calls for 100,000 cans per day. Now we do not propose or wish to have any more than what we absolutely require, and we should state that we are told that your company is short of cans, and that this is the cause of the delay in the delivery, * * * and we wish now to state that until further notice we wish delivered to our factory for the present 50,000 cans per day."

On July 25, 1899, the plaintiff sent the following notice to the defendant:

"We shall require to-day at our factory 45,000 2½″ small hole, and 12,500 large hole cans, with solder hemmed caps. * * * We shall also require for San José 15,000 2½″ small hole, and 10,000 2½″ large hole cans with solder hemmed caps. At least ½ of the San José cans must go forward today. They can be delivered to the railroad sheds in crates."

On July 27, 1899, the plaintiff sent the following notice to the defendant:

"We shall want for to-day, at our factory on Brannan St., 45,000 2½″ No. 2 cans and 12,500 2½″ No. 1 cans."

On July 28, 1899, the plaintiff sent the following notice to the defendant:

"We wish you to del. at the cannery to-day 45,000 2½″ No. 2 cans and 15,000 No. 1 cans."

On July 29, 1899, the plaintiff sent the following notice to the defendant:

"We shall require for to-day and to-morrow about a total of

| | | | | |
|---|---|---|---|---|
| 15,000 | No. | 1 | 2½″ | cans |
| 60,000 | No. | 2 | 2½″ | cans |
| 75,000 | | | | |

Also on Monday for San José a car with say

| | | | | |
|---|---|---|---|---|
| 7,500 | 3″ | cans | No. | 1 |
| 20,000 | 2½″ | cans | No. | 2 |
| 10,000 | 2½″ | cans | No. | 1 |
| 37,500 | | | | |

Also on Monday will want at S. F. cannery

| | | | |
|---|---|---|---|
| 45,000 | 2½″ | No. | 2 |
| 12,500 | 2½″ | No. | 1 |
| 57,500″ | | | |

On August 1, 1899, the plaintiff sent the defendant the following notice:

"We shall require for delivery to-morrow 45,000 2½″ No. 2 cans, and 12,500 No. 1 cans. We shall require about this quantity each day until further notice, delivered at our factory on Brannan St."

On August 4, 1899, the plaintiff sent the defendant the following notice:

"According to contract we could have asked for 100,000 per day, but are now taking here 50,000 per day, and less, and we are willing to put up with a little inconvenience when we do not sustain too much loss; but we cannot afford this. We have in past three weeks stopped at factory here no less than nine times. We have been willing to overlook this, but unless cans, go down tomorrow morning by passenger train, the loss at San José will be terrible. You have not seen fit to give us the same terms as other canneries get, but we have a right to be prevented from positive loss. Now we want shipped tomorrow (Saturday) before 6 p. m., either to the sheds or loaded in a car at your works for shipment to San José, 100 crates No. 1 2½ cans, 40 crates No. 2 2½ cans, and 20 crates No. 1 3 cans. Will these positively go and before 6 p. m.? If they are loaded in a car to pull out early we can get them Sunday morning and work that day, thus saving considerable fruit now spoiling through your delay."

Isidore Jacobs, plaintiff's president and managing director, testified that after some personal inquiry made to defendant's general manager in July as to a possible shortage of cans during the season, the plaintiff received cases enough until August 7th or 8th; he thought it was August 8th.

From July 20th, the date of the first letter, down to August 7th, the number of cans delivered, as shown by the accounts, was in excess of the number ordered.

On August 8th the plaintiff sent the defendant a letter containing the following notice:

"Kindly note that we shall require for delivery at our factory 55,000 cans per day to apply on our contract dated April 12, 1899, until further notice, which is much below what the contract calls for."

On August 26, 1899, the plaintiff sent the defendant the following notice:

"We shall require 45,000 to-day, and 25,000 to-morrow, which will enable us to catch up on the ripe fruit. If it is positively impossible for you to send us the quantity, please let us know what quantity we may expect, and we shall govern our pack accordingly, and not touch the overripe fruit at all, but save our good fruit."

On the same day the plaintiff sent the defendant the following notice:

"Referring to cans required for to-day, we will inform you that unless we get at least 45,000 cans to-day and 25,000 cans tomorrow, our loss will be, at a low calculation, $2,500."

On September 2, 1899, the plaintiff notified the defendant as follows:

"Please note that we absolutely need to make our pack of fruits at our factory 57,500 cans per day, and we are not getting sufficient cans; consequently we have had to sell some of our fruit on the market. Besides, if we do not get sufficient cans to-day, we will be confronted with a serious loss of fruit. We must have them."

In a postscript there is the following additional notice:

"We need to-day 57,500; 20,000 to-morrow, and 57,500 on Monday."

On September 4th the plaintiff sent the following notice to the defendant:

"Now to-day and to-morrow we shall positively need 57,500 cans per day, in order to save what fruit we have on hand at our factory. If you cannot give us this quantity, give us as many as you can, so that we can make the losses as light as possible."

On September 7th the plaintiff sent the defendant the following notice:

"We shall require to-day 35,000 2½″ cans, and 5,000 3″ cans."

On September 8th the plaintiff sent the defendant the following notice:

"Yesterday we only received 40,000 cans at our cannery, although our requirements were 60,000. We shall require positively to-day 55,000 2½″ cans and 5,000 3″ cans."

On September 11, 1899, the plaintiff sent the defendant the following notice:

"Kindly note that we shall require to-day delivered at our factory 53,000 2½″ cans. Kindly see that we get them. Also, we shall require 3,000 3″ cans, and 2,000 gallons."

On September 13, 1899, the plaintiff sent the defendant the following notice:

"Please notice that we shall require to-day 52,000 2½″ cans, 3,000 3″ cans, and 1,000 gallons, delivered at our cannery on Brannan St."

The letter of August 8, 1899, notified the defendant that plaintiff would require for delivery at plaintiff's factory 55,000 cans per day until further notice. The quantity of cans delivered on that day

amounted to 54,020, a shortage of 980 cans. No further written notice was given defendant of the number of cans required until August 26th. Between August 8th and August 26th, excluding both the first and last days and Sundays, there were 15 working days which, at 55,000 cans per day, would make an aggregate of 825,000 cans ordered by plaintiff. The defendant delivered during this period 856,682 cans, or 31,682 more than were ordered. But there were failures on two days to deliver 55,000 cans per day, namely, on August 24th, when only 19,750 cans were delivered, and August 25th, when none were delivered. The failure to deliver any cans on August 25th was by reason of a strike, or the refusal of the employés to work on that day. This fact excuses the defendant for its failure to make delivery on that day, under the terms of the contract, which provides that:

"If the seller shall be unable to perform any of its obligations under this contract by reason of a strike, or of damage by the elements, or of any unavoidable casualty, such obligations shall at once terminate and cease."

But how is the defendant excused for the failure to deliver the required number of cans on August 24th? The excuse given is that the aggregate of delivery for the 14 days preceding was in excess of the number of cans ordered for that period, and that this excess should be credited as a delivery when there was a shortage. The evidence, however, is that the cans were used as delivered, and there was no actual surplus on hand at any time. The plaintiff, on August 22d, wrote to the defendant:

"We would call your attention to the fact that our cans have been coming in very irregularly lately. The result has been that we have been stopped several times yesterday and several times to-day, resulting in considerable loss of time and labor."

On August 26th the plaintiff wrote to the defendant:

"Kindly note that our first load of cans did not get to us until 8 o'clock this morning, although the Chinese got there before 7 o'clock. The result was that we could not start our cannery going until we got our cans. In view of the fact that we have not been able to work for the past two days on account of not being able to get any cans, the result has been that the whole factory has been overrun with ripe fruit."

This statement has not been contradicted, and must be accepted as true. The situation, then, was this: During the period under consideration the defendant delivered on some days more than 55,000 cans, but these cans were used by plaintiff as delivered, and there was no accumulation or surplus, and the officers of the defendant knew this fact. It was therefore not excused for its failure to deliver the full number of cans ordered for August 24th. The defendant was required to deliver 55,000 cans per day. A delivery of more than 55,000 cans on any one day did not justify the defendant in delivering a correspondingly less number on the next day, if all the cans delivered on the first day were used on that day, and the defendant knew that fact, and knew that the full number of cans ordered were required for the succeeding day. For the 24th day of August there was therefore a shortage of 35,250 cans.

On August 26th the plaintiff ordered 45,000 cans for that day, and 25,000 cans for the next day, which was Sunday. In my opinion, the

defendant was not required to deliver cans on Sunday. It delivered 22,000 on Saturday, leaving a shortage for that day of 23,000 cans. On August 28th there was a delivery of 50,170 cans. The order of August 8th for 55,000 cans per day was still pending, and there was a shortage of 4,830 cans. On August 29th the plaintiff notified the defendant that it would require the full quantity of cans. This notice undoubtedly referred to the order of August 8th for 55,000 cans. The cans delivered amounted to 49,590, or a shortage of 5,410 cans.

The next order was on September 2d, when 57,500 cans were called for, to be delivered on that day, and 20,000 on the next day, which was Sunday. The cans delivered on Saturday amounted to 55,736, or a shortage of 1,764. No shortage is allowed for Sunday. On September 4th, 57,500 cans were ordered, and 53,737 delivered, a shortage of 3,764. On September 5th, 57,500 cans were ordered, and 39,900 delivered, a shortage of 17,600. There was no order in writing for September 6th. On September 7th, 40,000 cans were ordered, and 40,675 delivered. On September 8th, 60,000 cans were ordered, and 40,870 delivered, a shortage of 19,130. On September 11th, 58,-000 cans were ordered, and 41,390 delivered, a shortage of 16,610. On September 13th, 56,000 cans were ordered, and 41,338 delivered, a shortage of 14,662. We have here, in the period from August 8th to September 13th a total shortage of 143,000 cans. There were cans delivered down to September 23d, but there are no written orders for cans after September 13th, and the court cannot find from the evidence any shortage for this period. The conclusion reached by the court is that the plaintiff has established by the evidence that between August 8th and September 13th, the defendant failed to deliver 143,000 cans ordered by the plaintiff under the contract of April 12, 1899. Whether these ordered cans were to be made of domestic or imported tin, does not appear from the evidence; but as there was an absolute shortage for the whole season of 103,782 cans to be made of imported tin, and a shortage of 594,229 cans to be made of domestic tin (providing the plaintiff had ordered cans of domestic tin up to the full limit of 3,000,000 cans), we must assume that the cans ordered and not delivered, in excess of 103,782 cans, were to be made of domestic tin.

Now, let us see how the defendant meets the plaintiff's claim of shortage, a claim much larger than is here stated. The defendant divides the whole period between August 8th and September 23d into two periods, the first period that between August 8th and 28th, and the second from August 29th to September 23d. With respect to the first period the defense is that the defendant delivered to the plaintiff more cans than were demanded, or could have been used by the plaintiff's factory, and with respect to the second period, that the defendant delivered to the plaintiff more cans than were sufficient to use up all the fruit purchased by the plaintiff. We think the defense for the first period has already been disposed of by the evidence that there were shortages on the cans ordered, August 8th, 980 cans, August 24th, 35,250 cans, and August 26th, 23,000 cans, and August 28th, 5,500 cans, or a total of 64,060 cans, and at the end of the period the plaintiff was calling for more cans. It was doing more than that;

it was complaining that it was not receiving the cans it required. On August 29th, the day following the close of this first period, the plaintiff wrote to the defendant as follows:

"Please take notice that we are not getting the cans we need according to contract with you, consequently we shall lose considerable fruit."

This notice, together with the other letters written during this period, indicates that cans had not been delivered as ordered, and that a claim of shortage for that period is fully supported by the evidence.

With respect to the defense for the second period, it is claimed by the defendant that it furnished all the cans plaintiff required in its business. It will not be necessary to go into this evidence in detail. I think it establishes the fact that the plaintiff did throw away considerable fruit because it did not have the cans in which to place it, and to the extent that cans were actually ordered during this period, the plaintiff had sufficient fruit to use all the cans so ordered had they been delivered. The plaintiff claims damages for loss occasioned by the failure of the defendant to deliver to plaintiff during the season 403,200 cans, and it has introduced evidence tending to show that it would have used these cans in putting up fruit, as follows:

| | | |
|---|---|---|
| Pears | 312,000 | cans |
| Peaches | 60,000 | " |
| Plums | 31,200 | " |
| | 403,200 | cans |

The plaintiff has also introduced evidence tending to show that, failing to receive these cans, it has sustained loss as follows:

| | |
|---|---|
| Actual loss of fruit thrown away | $13,238 84 |
| Loss of labor | 1,135 00 |
| | $14,373 84 |

It has also introduced evidence tending to show that had the fruit been canned and packed, it could have realized a profit on the sale of the fruit at the market price in San Francisco of $10,765.50. It has also introduced evidence tending to show that it would have realized a net profit on the fruit, upon sales already made which it was not able to fill because of the failure to receive cans, amounting to $6,099.61.

The plaintiff submits these last two estimates of the profits that might have been realized, for the court to adopt one or the other, as it may determine the law to be, and it adds to each of them the loss of fruit thrown away and the loss of labor, as follows:

| | |
|---|---|
| Profit on fruit at market price | $10,765 50 |
| Actual loss of fruit thrown away | 13,238 84 |
| Loss of labor | 1,135 00 |
| Damages | $25,139 34 |
| Profit on fruit on sales already made | $ 6,099 61 |
| Actual loss of fruit thrown away | 13,238 84 |
| Loss of labor | 1,135 00 |
| Damages | $20,473 45 |

Both of these calculations are based upon the claim that the defendant failed to deliver to the plaintiff 403,200 cans, as ordered; but, having determined that the failure was to deliver 143,000 cans as ordered, and not 403,200 cans, the method of calculating the damages, whatever it may be, must be adjusted to the former quantity. The damages are claimed by plaintiff under the provisions of section 3300 of the Civil Code, which provides as follows:

"For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which in the ordinary course of things would be likely to result therefrom."

If any damages are to be awarded, the defendant relies upon section 3308 of the Civil Code, which provides as follows:

"The detriment caused by the breach of a seller's agreement to deliver personal property, the price of which has not been fully paid in advance, is deemed to be the excess, if any, of the value of the property to the buyer, over the amount which would have been due to the seller under the contract, if it had been fulfilled."

Section 3354 of the Civil Code prescribes the mode for ascertaining the meaning of the term, "value of the property to the buyer." The section provides as follows:

"In estimating damages, except as provided by sections thirty-three hundred and fifty-five and thirty-three hundred and fifty-six, the value of property to a buyer or owner thereof, deprived of its possession, is deemed to be the price at which he might have bought an equivalent thing in the market nearest to the place where the property ought to have been put into his possession, and at such time after the breach of duty upon which his right to damages is founded as would suffice, with reasonable diligence, for him to make such a purchase."

But the evidence shows that it was impossible for the plaintiff to purchase cans to supply the shortage; indeed, the fact was that there was a shortage of tin that season in the manufacture of cans, and the canneries in San Francisco had to submit to a reduction in the quantities of cans supplied, which had some relation to the quantities required. The circumstance of this shortage does not, however, excuse the defendant from furnishing the plaintiff with the cans ordered. It is referred to only as a fact showing that the plaintiff could not purchase the cans it required in the market, and is therefore not subject to the rule of damages prescribed in sections 3308 and 3354 of the Civil Code.

In McKay v. Riley, 65 Cal. 623, 4 Pac. 667, the action was for damages for breach of contract for the sale of a certain amount of boiler tubes at a price agreed upon. The plaintiff, on the faith of this agreement, contracted with a third party to sell the goods to him at an advanced price. The defendant failed to deliver the boiler tubes in accordance with the terms of the contract. No other articles of a similar kind could be procured in the market. With respect to the measure of damages in such a case, the court said:

"There was evidence tending to prove that no considerable quantity of the pipe, the subject of the contract sued on herein, was in other hands than those of defendants. If the jury were satisfied there was no market value

for the articles, they were justified in allowing plaintiff, as damages, the amount he lost by reason of his not being able to perform his agreement to deliver the pipe to third persons at an advanced price. Ordinarily, the rule of damages in actions like the present is the difference between the price agreed to be paid and the market value, because the vendee can obtain the article contracted for at the market price. When, however, the circumstances are such that the vendee cannot thus supply himself, the rule does not apply, for the reason of it ceases. Bank v. Reese, 2 Casey (Pa.) 143. In such case the true measure of damages is the actual loss sustained by the vendee, by reason of his not receiving an advance or profit through agreements which he himself has made in reliance upon the fulfillment of his vendor's contract. McHose v. Fulmer, 73 Pa. 367."

The doctrine of this case is applicable to the present controversy, and determines the rule that should be followed in ascertaining the damages that plaintiff should recover. Under this rule the actual loss sustained by the plaintiff consists in the profits on the goods sold and not delivered, added to the cost of the fruit thrown away because cans were not furnished by the defendant as ordered, and the cost of labor not utilized for the same reason. As before stated, the evidence tends to show that for the failure to supply 403,200 cans during the season the loss was $20,473.45. But I find that the failure of the defendant to supply cans to the plaintiff as ordered amounted to only 143,000 cans for the season. The loss must therefore be adjusted to the lesser quantity, which of course will be one of proportion, and amounts to $7,264.75, and this amount I find is the damage which plaintiff sustained by reason of defendant's failure to furnish 143,000 cans, as ordered by plaintiff.

The defendant in an amended answer sets up a promissory note given by the plaintiff to the defendant, dated January 1, 1900, for the sum of $3,034.16. It is alleged that no part of the principal or interest has been paid, and that the defendant's cause of action against plaintiff on this note arose out of the transactions set forth in the complaint as the foundation of plaintiff's claim, and is connected with the subject of the action. I find that this note is made up of two items, viz., $1,393.44 on account of an indebtedness in favor of the defendant and against the plaintiff arising before the packing season of 1899, and $1,640.72, made up of two items of $836.80 and $803.92, both being for cans delivered during the season of 1899, out of which this suit arises.

The sum of $1,640.72 will therefore be deducted from the amount determined as damages, and a judgment entered accordingly.